# EXHIBIT "1"

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIBEL EDMONDS | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | *   Civil Action No. 05-540 (RBW) |
| UNITED STATES OF AMERICA | * |
| | * |
| Defendant | * |

\* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF MARK S. ZAID, ESQ.

I, MARK S. ZAID, pursuant to 28 U.S.C. § 1746, hereby certifies as follows:

1. I am a person over eighteen (18) years of age and competent to testify. I make this Certificate on personal knowledge and in support of the Motion for Leave to Withdraw as Plaintiff's Counsel.

2. I am admitted to practice law in the States of New York, Connecticut and the District of Columbia, as well as before the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York and the Southern District of New York.

3. I have been a law partner of Roy W. Krieger in the Firm of Krieger & Zaid, PLLC since September 1, 2002. Each of us owns 50% of the firm. Our area of practice focuses primarily on national security law. We represent many "whistleblowers" on issues of national security.

4. We have been representing Ms. Sibel Edmonds in numerous matters, to include this case, against the Department of Justice since March 2004. I am submitting this Certificate in compliance with LCvR 83.2(h) and 83.6(c) and with my ethical duties set

forth in Rule 1.16 of the Rules of Professional Conduct.

5.   During the course of the representation there have been several occasions where I have notified Ms. Edmonds of our intention/interest in withdrawing from representation due to, what we viewed as, obdurate or vexatious conduct on the part of Ms. Edmond that rendered our representation unreasonably difficult. Those occasions were eventually all resolved amicably and because they were private between only myself (and sometimes including Mr. Krieger) and Ms. Edmonds (and sometimes her spouse) and fall within the attorney-client privilege, I am refraining from discussing any specifics unless otherwise directed by this Court. Suffice to say the nature of the conduct primarily related to differences in strategy and was not too dissimilar to the current conflict.

6.   The latest conflagration, however, is vastly different. On this occasion Ms. Edmonds saw fit to publicly defame me, as well as place me in a false light, to members of the very specific community of which I function as an attorney (and have for many years). The damage to our relationship extends too deep this time to be remedied in any reasonable period of time. The fact that Ms. Edmonds, as will be seen from her writings, cannot fathom the schism she has caused is as much a part of the problem as her conduct. The circumstances of what transpired are set forth in detail and are particularly self-evident from the relevant e-mails.[1]

7.   I was scheduled to testify on December 6, 2005, before a Subcommittee of the U.S. House of Representative's Government Reform Committee on the topic of national

---

[1] None of the information set forth in any document associated with this filing falls within the attorney-client privilege. All facts and accompanying exhibits involved third-parties outside of the representation.

security whistleblowers and security clearances. I frequently represent cases/clients involving these issues. Other witnesses included representatives from the Government Accountability Project ("GAP") and the Project on Government Oversight ("POGO"), two non-profit organizations that also focus on whistleblowers and, at times, have dealt with security clearance matters. Ms. Edmonds, in her capacity as President of the National Security Whistleblower's Coalition ("NSWB") (*http://www.nswbc.org/ index.htm*), opposed the hearing on the grounds that it did not include anyone from her organization, or any perceived national security whistleblowers, as witnesses. My participation was not an issue, and was actually supported by both Ms. Edmonds and the NSWB.

8. Though we both shared the same ultimate objectives, I differed fundamentally with Ms. Edmonds on the course of strategy that the NSWB was pursuing with respect to this particular Congressional hearing. At her request numerous people were writing and calling the Subcommittee and complaining, as well as threatening to boycott the hearing. As a result, at least in part, due to the actions of Ms. Edmonds the scheduled hearing was postponed until January 2006. I am still scheduled to testify.

9. In response to correspondence Ms. Edmonds sent to the Subcommittee Chief Counsel, Larry Halloran, Mr. Halloran sent a response that was copied to several of the witnesses, to include myself, GAP, POGO and Ms. Edmonds. See Exhibit "A". As far as I knew, we were all substantively, ostensibly, working together for the hearing. This e-mail started the disintegration.

10. One of the witnesses from GAP immediately responded with his own position of the issues. See Exhibit "B". All I did was then simply articulate to the other scheduled witnesses, and the leadership of their organizations (I specifically deleted the Congressional staff from the e-mail as they had no need to know of what I viewed was an internal dispute among the groups who were all working together) my position on what transpired and the concerns I held regarding the turn of events. At no time did I make any personal attack. See Exhibit "C". The NSWB's Senior Advisor, Dr. William Weaver, responded to my comments. See Exhibit "D". I then further articulated my position and concerns regarding the NSWB's stance in relation to the hearing, and questioned who would best be a witness in this particular hearing. See Exhibit "E". The key comment that I made, which was based on my years of experience on national security cases and lobbying (which included testifying before Congress on several occasions), which set off Ms. Edmonds, was:

> *"Bill, with all due respect, who exactly did NSWBC want to testify? You? Sibel? Neither of whom has any - to my knowledge - actual experience with security clearances either. Many of the NSWBC's members never had a security clearance problem either. And for those who did, there is little, if any, evidence that they were retaliated against for being whistleblowers. The fact is that anything can be utilized as a "legitimate" reason to strip someone of their clearance. Nor would many NSWBC members make for a very good witness (and I have met many of them). Either they have too many negatives associated with their case or they would be too emotional or disjointed in their testimony. These are legitimate concerns."*

11. As would seem obvious on its face, I merely set forth a general position regarding my concerns as to the need/desire to have a NSWB member participate at the hearing as a witness. I did not mention any specific person. I did not reference any specific case. And

I certainly did not call into question the credibility of any particular member, much less any member. In fact, I specifically stated in an e-mail that Ms. Edmonds sent that *"You know I adore and support you, both personally and professionally, but in my opinion this issue was seriously mishandled and caused significant harm to the cause we all support. The question now is whether that harm is temporary or permanent."* See Exhibit "F". Again, this was nothing more than a comment concerning strategy, and should not reasonably be construed as a personal attack on Ms. Edmonds, much less any national security whistleblower.

12. Ms. Edmonds forwarded my initial response to apparently more than 100 persons. The exact scope of the dissemination is not known but at the very least it included the majority, if not all, of the members of the NSWB, several of whom have been or are clients of mine, or have approached me for representation over the years. Were it just the text of my e-mail that had been disseminated, there would be no issue. However, Ms. Edmonds took it upon herself to include commentary that was extremely unfavorable and defamatory. She also completely distorted my stated position and placed me in a false light that further denigrated my reputation. See Exhibit "G". Instead of accurately quoting me as writing *"Nor would many NSWBC members make for a very good witness (and I have met many of them). Either they have too many negatives associated with their case or they would be too emotional or disjointed in their testimony. These are legitimate concerns,"* Ms. Edmonds claimed I wrote: *"I have met almost all NS whistleblowers, none of them would make credible witnesses..."* The sentiments expressed in Ms. Edmonds' characterization are not even close to what I wrote.

13. Ms. Edmonds also insinuated or stated outright falsely that I have portrayed myself as a "supposed guardian angle of WBs", that I have been acting adversely to the interests of whistleblowers behind their back to Congress, that I am "sour", that individuals and entities have questioned my qualifications to represent whistleblowers, that I am a "disgusting careerist" who has lived off of whistleblowers, and questioned what I have achieved for whistleblowers. Id. I have no idea what the basis was for her assertions for none are true.

14. Dr. Weaver also responded to my e-mail. See Exhibit "H". Ms. Edmonds forwarded that e-mail, presumably to the same list of recipients as her prior e-mail, and specifically insinuated that I was no "friend" of national security whistleblowers. See Exhibit "I". These two e-mails led to several disparaging e-mails from her recipients specifically negatively commentating about me (and only me, even though Ms. Edmonds and Dr. Weaver complained about POGO and GAP), particularly based on the false characterizations Ms. Edmonds promoted. See Exhibit "J" (although at least one NSWB member questioned Ms. Edmonds' comments, and I know of one member who resigned from the group in large part due to these events and how I was treated). I only know of these e-mails because they were sent to me either by Ms. Edmonds or the actual sender. For all I know there were dozens of negative e-mails and discussions further defaming my character all due to Ms. Edmonds' description and numerous other individuals may have been bcc'd or forwarded the e-mails around. Ms. Edmonds continued to send disparaging e-mails concerning me to third parties with further false assertions that I was

"bitter" and negatively insinuating that I have lost perspective of my beginnings. See Exhibit "K".

15. Ms. Edmonds' husband, who also is very active with the NSWB (and will be a board member upon incorporation) and essentially is also a client given his spousal relationship, also sent a long e-mail attacking me personally and my professional credibility. See Exhibit "L". The ending of his message said it all: *"Therefore you have a choice to make; you can either come on board and work with NSWBC to try to affect positive change, or you can take your ball and go home. If you choose the later, then please stay out of the way, for if you are not going to be part of the solution, then you are part of the problem."* Id. This has been a common theme to Mr. and Ms. Edmonds' conduct: either you are allied with them, or you are against them and an enemy.

16. I understandably found it necessary to respond to the defamatory personal attacks, and I twice asked that my response be forwarded to the NSWB members. See Exhibit "M". From subsequent e-mail transmissions, and notwithstanding Ms. Edmonds' assurance she would do so, this was apparently never done. Following my responses both Mr. and Ms. Edmonds seemed to backtrack from their prior statements, or at the very least wrote very conflicting and contradictory comments (at times seemingly praising me). See Exhibit "N". For example, Ms. Edmonds wrote:

> *"And one last thing, you were and are my attorney, I have always been proud of being represented by you; and how could I be perceived as going around and putting down my own attorney; which I never did. Who do you think we would call to get advice on legal aspects when we are getting ready to testify? Right; you know the answer: You."*

7

Id. Despite Ms. Edmonds' purported rationale, no reasonable person can distinguish between this positive comment and the negative attacks she launched upon me. Clearly she was, in her own words, "putting down my own attorney".

17. At no time since the recent controversy arose has either Ms. Edmonds or her spouse apologized to me. At no time has either conveyed any willingness to apologize or even send clarifying statements to those who received the disparaging e-mails sent by Ms. Edmonds or Mr. Edmonds. These e-mails attacked me on a very personal level. They called into question my bona fides and my intentions. They disparaged my professional reputation in the very community in which I devote much of my time. The damage that has been caused could be wide reaching and possibly never corrected. I may never know whether I lost clients as a result of the conduct of Mr. or Ms. Edmonds. If this is not obdurate or vexatious conduct than I really don't know what is. Clearly, these circumstances have rendered our representation of Ms. Edmonds unreasonably difficult.

18. In my opinion, it is nonsensical to think that this has not or should not impact the legal relationship that exists between Ms. Edmonds and my law partner and I. Ms. Edmonds may wish to believe that her derogatory, and very public, comments about me is irrelevant to her desire to have me or Mr. Krieger continue to represent her interests, but it is certainly not irrelevant to either myself or my law partner in our desire or ability to represent her interests. We should not have sit idly by while our own client publicly disparages my reputation upon a whim or reflex. As attorneys we are not beholden to clients for all eternity and just as clients can "fire" their attorney, so too can an attorney "fire" their client.

19. With respect to this case, it is in its infancy. It was filed on March 16, 2005, but service was not immediately effected due to the existence of other pending litigation. The Government only filed its initial Motion to Dismiss on September 20, 2005. Ms. Edmonds' response is currently due on December 21, 2005 (we are filing a contemporaneous Motion for Extension seeking 60 days to allow the Court to resolve this Motion and/or to permit Ms. Edmonds time to secure new counsel). No discovery has taken place. No court appearances have occurred. Indeed, no significant expenditure of time has been devoted by either side or the Court.

20. Thus, there will be no actual or perceived prejudice incurred by Ms. Edmonds were we to withdraw. New counsel can easily be brought up to speed on Ms. Edmonds' claims and we, of course, are more than willing to cooperate with any new counsel. Moreover, Ms. Edmonds has been and ostensibly remains represented by not only the ACLU but at least one other attorney in New York City who continues to provide her legal advice. In fact, several of the members of NSWB are attorneys as well, and no doubt they can provide legal assistance, at least temporarily. It may very well be that she can persuade one or more of these attorneys to assist her in the substantive aspects of the case, or to help locate new counsel.

21. Although our basis for withdrawal is due to the obdurate and vexatious conduct of Ms. Edmonds and her spouse, let me be clear that none of our reasons involve fraudulent or criminal conduct on the part of Ms. Edmonds or reflects any belief that her case lacks merit.

22. In closing, I formally notified Ms. Edmonds that we planned to withdraw from her case on November 30, 2005. Although we requested her consent and continued a dialogue on this topic for nearly two weeks, she declined to grant it. As noted, we offered to cooperate with any new counsel and to seek, as we have, an additional extension of time for her to obtain new counsel and respond to the Government's Motion. We took all reasonable steps to mitigate any consequences to Ms. Edmonds. To date, Ms. Edmonds has not notified us of the entry of new counsel or of her willingness to represent himself. Unfortunately, our discussions have become only more heated and further demonstrate why withdrawal is necessary.

23. I have sent copies of these pleadings to Ms. Edmonds at her last known current address of 6631 West Wakefield Drive, Alexandria, Virginia 22307, as well as via e-mail.

I have also provided her, pursuant to the Local Rules, with formal notice that she should obtain other counsel, or if she intends on representing herself or reject to our withdrawal, to so notify the Clerk of the Court in writing within 5 days of service of this Motion.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   December 12, 2005

/s/
_____

Mark S. Zaid