UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SIBEL EDMONDS                         *
                                      *
            Plaintiff,                *
                                      *
v.                                    *
                                      *   Civil Action No. 05-540 (RBW)
UNITED STATES OF AMERICA              *
                                      *
            Defendant                 *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MOTION FOR RECUSAL AND/OR DISQUALIFICATION OF
## JUDGE REGGIE B. WALTON

NOW COMES the plaintiff Sibel Edmonds, pro se, to respectfully move the Court to recuse

itself in the present action.


Date: March 22, 2006


                              Respectfully submitted,


                              /s/
                              Sibel Edmonds
                              12 Wolfe Street
                              Alexandria, Virginia 22314
                              (703) 519-3640

RECEIVED

MAR 2 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## CERTIFICATE OF GOOD FAITH

I HEREBY CERTIFY that this **MOTION FOR RECUSAL AND/OR DISQUALIFICATION**

**OF JUDGE REGGIE B. WALTON** is made in good faith, and in the honest belief that Judge

Walton should be disqualified from this action under 28 U.S.C. §§ 144, 455(a).

Date: March 22, 2006

/s/

Sibel Edmonds

## CERTIFICATE OF FACTS IN PLAINTIFF'S KNOWLEDGE

I HEREBY CERTIFY that the events related in the **STATEMENT OF FACTS** in Plaintiff's

**MOTION FOR RECUSAL AND/OR DISQUALIFICATION OF JUDGE REGGIE B.**

**WALTON** are in the personal knowledge of the pro se Plaintiff.

Date: March 22, 2006

/s/

Sibel Edmonds

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SIBEL EDMONDS | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 05-540 (RBW) |
| UNITED STATES OF AMERICA | * | |
| | * | |
| Defendant | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO RECUSE AND/OR DISQUALIFY

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.     Judge Walton Must Disqualify Himself On Perception That the Case
          Assignment Process of the D.C. District Court Has Been Subverted in
          the Present Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.    Judge Walton Must Be Disqualified for His Demonstrated Penchant for
          Secrecy in Apparent Violation of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## INTRODUCTION

Section 455(a) of Title 28 of the United States Code requires a federal judge to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." Judge Walton should disqualify himself from the present case for two reasons, both of which alone bring his impartiality into question.

First, Judge Walton ruled against Plaintiff in a previous case and the set of events leading to the present case being assigned to Judge Walton would lead a reasonable person to question the integrity of the case assignment process and whether or not such process had been subverted, in violation of local rules, to put the present case before Judge Walton to the detriment of the Plaintiff.

Second, Judge Walton has a bias to secrecy that greatly favors the Defendant's position, and this bias has been exercised against the Plaintiff's interests in a previous case. This demonstrable bias to secrecy creates a reasonable doubt concerning Judge Walton's impartiality in the present case.

## STATEMENT OF FACTS

1. In July 2002, Plaintiff, Sibel Edmonds, filed a Freedom of Information Act claim in the D.C. federal court, and the case was assigned to Judge Ellen Segal Huvelle. *Edmonds v. Federal Bureau of Investigation,* 02CV1294 (ESH) (*Edmonds I*).

2. July 22, 2002, Plaintiff, Sibel Edmonds, filed an action with the D.C. federal court against the United States alleging violation of First Amendment and privacy rights, and the case was assigned to Judge James Robertson. *Edmonds v. Ashcroft,* 1:02CV01448 (RBW) (*Edmonds II*).

1

3. On August 30, 2002, Plaintiff's motion in *Edmonds II* to compel the testimony of two witnesses, Melek Can Dickerson and Major Douglas Dickerson (The Dickersons), who were scheduled to leave the United States on September 6, 2002, was granted by Judge James Robertson.

4. On October 18, 2002, Attorney General John Ashcroft invoked the State Secrets Privilege in *Edmonds II.*

5. On February 6, 2003, *Edmonds II* was removed from Judge James Robertson and assigned to Judge Reggie Walton without explanation.

6. On March 13, 2003, Plaintiff filed a motion to request that *Edmonds II* be transferred from Judge Reggie Walton to Judge Ellen Segal Huvelle, the judge presiding over *Edmonds I* since July 2002.

7. On May 7, 2003, the court granted the Plaintiff's requested transfer of *Edmonds II* from Judge Walton to Judge Huvelle.

8. On May 9, 2003, two days after the court assigned *Edmonds II* to Judge Huvelle, the court transferred *Edmonds II* back to Judge Walton without explanation.

9. On February 12, 2003, Judge Walton scheduled the first Status Hearing for *Edmonds II* for March 6, 2003, at 9:00 a.m.

10. On March 6, 2003, the day of the scheduled status hearing on *Edmonds II*, Judge Walton, without explanation, postponed the status hearing to July 25, 2003.

11. On July 24, 2003, one day before the rescheduled status hearing in *Edmonds II*, Judge Walton postponed, without explanation, the hearing to October 2003.

2

12. October 2003, one day before the rescheduled hearing in *Edmonds II*, Judge Walton again postponed the hearing, stating that his court had to obtain security clearance and access for court clerks, and that this process was to be expedited and completed within ten business days.

13. From October 2003 until April 27, 2004, the court in *Edmonds II* did not communicate with Plaintiff, supplying no explanation for the delay.

14. On April 26, 2004, after plaintiffs' counsel in *Burnett et al. v. Al Baraka Investment & Dev. Corp.*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), representing over 1000 9/11 victim family members in a lawsuit against the Saudi Arabian Government and various businesses, issued a subpoena for a deposition from Plaintiff, the Defendant asked Judge Walton for an emergency hearing to quash the subpoena and invoked the State Secrets Privilege for a second time.

15. On April 27, 2004, Judge Walton provisionally quashed the deposition request. *Burnett et al. v. Al Baraka Investment & Dev. Corp.*, 323 F. Supp. 2d 82 (D.D.C. 2004) (*Burnett*).

16. On June 3, 2004, Judge Walton held an ex parte, in camera, briefing to hear "classified" declarations by the government.

17. On June 23, 2004, Judge Walton granted in part and denied in part the government's motion to quash, and prohibited the asking of many questions submitted in advance by counsel for plaintiffs in *Burnett*. These prohibitions were based on Defendant's assertion of the State Secrets Privilege. *Id.* at 84. Examples of questions protected by Judge Walton's order, the answers to which would allegedly cause grave damage to the national security are (Order and attachments at Exhibit A):

        a.      "When and where were you born?"

        b.      "Where did you go to school?"

c.    "What did you focus your studies on in school?"

d.    "What languages do you speak?"

e.    "What is your fluency or proficiency in each of these languages?"

f.    "In what capacity have you been employed by the United States government?"

g.    "Have you met Senate staff members in any unclassified conferences?"

h.    "Did you write a letter dated February 16, 2004, to Senator Charles Grassley?"

i.    "On Sunday, October 27, 2002, the tlevision news program '60 Minutes' aired an interview wherein Ed Bradley asked you questions, correct?"

j.    "Are you aware that United States Attorney General Ashcroft has asserted State Secrets Privilege concerning much information that you possess?"

18. On July 6, 2004, two years after the Plaintiff filed *Edmonds II*, Judge Walton ruled against her and granted the Government's motion to dismiss the action based on the State Secrets Privilege. *Edmonds v. Department of Justice*, 323 F. Supp. 2d 65 (D.D.C. 2004).

19. On March 16, 2005, the Plaintiff filed with the D.C. federal court a new and separate claim under the Federal Tort Claims Act (FTCA), and the case was randomly assigned to Judge Robertson. *Edmonds v. Department of Justice*, 1:05-CV-00540 (RBW) (*Edmonds III*).

20. On March 21, 2005, *Edmonds III* was removed from Judge Robertson and reassigned to Judge Walton without explanation.

## ARGUMENT

Though "judges are presumed to be impartial," *Tripp v. Executive Office of the President*, 104 F. Supp. 2d 30, 34 (D.D.C., 2000), 28 U.S.C. 455(a) requires a federal judge to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." The standard for disqualification under this statute is an objective standard, *Liteky v. United States*, 510 U.S. 540, 548 (1994), and the purpose of the statute is "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988). No actual bias need be demonstrated by the moving party, for §455(a) "focuses on the appearance of impartiality, as opposed to the existence in fact of any bias or prejudice, [and] a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street." *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980). In stark terms "what matters is not the reality of bias or prejudice but its appearance." *Liteky* at 458.

The apparent integrity of the judicial process and maintenance of the perception that courts are impartial venues are the chief goals of the statute, and judges must disqualify themselves even when "false and erroneous . . . allegations" are the bases of a motion for recusal if the court's impartiality may reasonably questioned because of such allegations. *Church of Scientology v Cooper* 495 F Supp 455, 461 (C.D. Cal. 1980). Section 455 was intended to overrule the "duty to sit" concept, and once a movant demonstrates facts that reasonably call into question a judge's impartiality the judge must disqualify himself. *Smith v. Pepsico, Inc.*, 434 F Supp 524 (S.D. Fla. 1977); *United States v. Corr*, 434 F. Supp. 408 (S.D.N.Y. 1977).

5

## I. Judge Walton Must Disqualify Himself On Perception That the Case Assignment Process of the D.C. District Court Has Been Subverted in the Present Case.

Local Civil Rule 40.2(a) directs that "except as otherwise provided by these Rules, civil, criminal and miscellaneous cases shall be assigned to judges of this court selected at random." Further, "all proceedings in a case after its assignment shall be conducted by the judge to whom the case is assigned, except as otherwise provided in these Rules." Local Civil Rule 40.3(f). On February 6, 2003, *Edmonds II* was removed from Judge Robertson and reassigned to Judge Walton. On March 13, 2003, Plaintiff filed a motion to request the case to be transferred from Judge Walton, and be assigned to Judge Huvelle, who had presided over *Edmonds I* since July 2002. That request was granted on May 7, 2003. Two days later, on May 9, *Edmonds II* was transferred back to Judge Walton. On July 6, 2004, Judge Walton granted the Government's motion to dismiss, stating that assertion of the State Secrets Privilege prevented the case from going forward. 323 F. Supp 65 (D.D.C. 2004)

On March 16, 2005, the Plaintiff filed in D.C. federal court a new and separate claim under the Federal Tort Claims Act, and the case was randomly assigned to Judge Robertson. 1:05-CV-00540-RBW. But five days later, on March 21, 2005, Plaintiff's FTCA Claim was removed from Judge Robertson and reassigned to Judge Walton. This set of facts reveals three apparent violations of local rules governing the assignment of cases.

The first apparent violation is the February 6, 2003, reassignment of *Edmonds II* from Judge Robertson to Judge Walton. Statement of Facts ¶¶ 2-5. This reassignment is troubling not only for its apparent violation of local rules, but also because it comes after Judge Robertson granted Plaintiff's motion to compel testimony from The Dickerson's and an initial assertion of the State Secrets Privilege by Attorney General Ashcroft. Judge Robertson, already invested in

6

the case and demonstrating a fair consideration of Plaintiff's position, was nevertheless removed without explanation.

Second, Plaintiff's request to transfer *Edmonds II* from Judge Walton to Judge Huvelle was granted, but then two days later the case was transferred back to Judge Walton. Statement of Facts ¶¶ 6-8. This action raises two points of impropriety: 1) The transfer of *Edmonds II* back to Judge Walton after its reassignment to Judge Huvelle had been granted; 2) The transfer away from a court handling a related case that is the oldest docket of the two. On this second point, Local Civil Rule 40.5(a)(2) deems that cases are related if they "(ii) involve common issues of fact, or (iii) grow out of the same event or transaction." When cases are related "the Clerk shall assign the new case to the judge to whom the oldest related case is assigned."

Local Civil Rules 40.5.(c)(1). *Edmonds I*, filed first in time, concerned the same set of events, facts, and transactions. Under the local rules a related case by the Plaintiff filed later in time should have been assigned to Judge Huvelle. The transfer to Judge Huvelle of *Edmonds II*, its reassignment back to Judge Walton, and the apparent contravention of local rules in not combining related cases gives rise to a reasonable belief that the case assignment process of the D.C. Federal District Court was subverted in the present case.

Further, *Edmonds I*, before Judge Huvelle, turned on Exemption 1 of the Freedom of Information Act, which protects against disclosure information "(A) specifically authorized under criteria established by an Executive order to be secret in the interest of national defense or foreign policy and (B) [information that is] in fact properly classified pursuant to such Executive order." 5 U.S.C. §552(b)(1). *Edmonds II*, before Judge Walton, hinged on the appropriate assertion of the State Secrets Privilege. The proximity of these issues should have required that the cases be combined, and Judge Walton lends evidence to this view by noting in his opinion

7

that "of particular significance to this case is Judge Huvelle's grant of summary judgment to the government on its assertion of Exemption 1 of the FOIA as grounds for refusing to disclose certain documents." 323 F. Supp 65, 68 (D.D.C. 2004).

Third, when Plaintiff filed her FTCA Claim, on March 16, 2005, it was originally assigned to Judge Robertson. Apparently in accordance with Local Civil Rule 40.5(a)(4), which deems that cases "shall be deemed related where a case is dismissed, with prejudice or without, and a second case is filed involving the same parties and relating to the same subject matter," the FTCA Claim was reassigned to Judge Walton. But there were two judges that met the requirements of this rule: Judge Walton and Judge Huvelle. Judge Huvelle presided over *Edmonds I* and was the judge with the longest record of involvement in the Plaintiff's actions. No explanation for selection of Judge Walton over Judge Huvelle was given.

It is clear that case assignment committees have great discretion to redirect cases to ensure court efficiency. The two reasons often cited in support of case assignment systems are equitable work distribution among judges and the prevention of "judge shopping." But the random case assignment system fulfils an additional, and equally important, purpose: it is an assurance to the public that case assignments are not manipulated to the detriment of litigants.

Perceived fairness in the courts is a requirement in a democracy, and it is crucial to "'generat[e] the feeling, so important to a popular government, that justice has been done', by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Marshall v. Jerrico*, 446 U.S. 238, 242 (1980) quoting *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring).

8

The convoluted movement of Plaintiff's claims among courts all leading back to Judge Walton creates the perception that the system has been manipulated. Indeed, a Google search of the internet shows numerous news websites and bloggers advancing the belief or implying that the assignment of Judge Walton to both Plaintiff's cases and that concerning the prosecution of Lewis Libby is anything but coincidence. Many of these commentators also claim or imply that these cases were assigned to Judge Walton to be disposed of in favor of the Government. For example, one commentator writes:

> So to quickly sum up, we have a judge [Walton] with little background available, with long ties to the Bush's [sic], who someone doesn't want the public to know his financial dealings, who has denied requests for domestic intelligence records (at least once), who has now been mysteriously "randomly assigned" to not only hear Edmonds' FTC case, but is also assigned to a case regarding a senior White House official with whom this judge and the defendant worked with the White House at the same time, albeit in different capacities. Have we flunked the infamous Dan Burton "smell test" yet? (Attached at Exhibit A).

Whether or not these perceptions are correct is irrelevant. Section 455(a) requires disqualification whenever a judge's "impartiality might reasonably be questioned," and the rule does not require a factual showing of lack of impartiality. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988). The perceived manipulation of the case assignment process, which is clearly reflected in a great swath of published public opinion and speculation, leads to the perception that Judge Walton will not act impartially with respect to Plaintiff's case.

Neither does §455(a) require a judge to have knowledge of facts creating a perception of a lack of impartiality. The operation of the statute "does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might

9

reasonably believe that he or she knew." *Id.* at 860. Once the judge is made aware of the perception, he is under a duty to disqualify himself. *Id.*

It is enough to meet §455(a) that the public perceive that Judge Walton knew of attempts to purposely manipulate the case assignment process to get the Plaintiff's cases before his court. As cited above and in Exhibit B, there is substantial public perception that the case assignment process was manipulated in order to put the Plaintiff's cases before Judge Walton where they would treated in a biased manner.

The facts, events, and rulings are such that a reasonable person looking at the transfer and reassignment of Plaintiff's claims would come to the conclusion that the case assignment process had been manipulated in contravention of court rules, and that Judge Walton lacks the necessary impartiality to hear Plaintiff's present case before his court.

A goal of the case assignment process, to supply reassurance to the public that there is a neutral system for distribution of cases to judges, is undermined by the events related to assignment of Plaintiff's cases. Deviation from the announced system, regardless of whether justified internally or not, may, and in this case has, create the perception of impropriety and that such perceived impropriety occurred to pass cases to a particular judge who has reason to be biased against a party in the case.

## II. Judge Walton Must Be Disqualified for His Demonstrated Penchant for Secrecy in Apparent Violation of Law.

Judge Walton disposed of *Edmonds II* on the basis of the Government's assertion of the State Secrets Privilege, "albeit with great consternation." 323 F. Supp. 2d 65, 82 (D.D.C. 2004). On the same day as the decision in *Edmonds II*, Judge Walton provisionally quashed a subpoena for a deposition of Plaintiff by attorneys in *Burnett et al. v. Al Baraka Investment & Dev. Corp.*

10

323 F. Supp. 2d 82 (D.D.C., 2004). Attorney General Ashcroft subsequently asserted the State

Secrets Privilege to prevent the deposition of Plaintiff in *Burnett*, and on further consideration

Judge Walton granted in part and denied in part General Ashcroft's motion to quash. In limiting

the deposition in *Burnett*, Judge Walton permitted the following proposed questions (Order and

attachments at Exhibit A):

- "What is your name?"
- "When did you come to the United States?"
- "Are you a resident of the United States?"
- "What is the level of your education?"
- "After your schooling what was your first, etc., employment?"
- "Have you ever been employed by the United States government?"
- "During what time period were you employed by the United States government?"
- "Do you still work for the United States government?"
- "Are you employed now? If so, what is your employment now?"

But Judge Walton held that the State Secrets Privilege prevented the asking of all other proposed

questions.

Questions such as the Plaintiff's place and date of birth, spoken languages, where she

attended college, and whether or not she met in unclassified settings with congressional staff

members or wrote an unclassified letter to a member of congress were held to threaten national

security. This ruling would mean that Plaintiff's driver's license, birth certificate, school

transcripts, and who she has talked with in a public setting threaten the national security of the

United States.

Information that would be permissible to impart over coffee at Starbucks was withheld

from deposition. Emblematic of Judge Walton's perceived dedication to secrecy is the

prohibition against asking the Plaintiff "Are you aware that United States Attorney General

Ashcroft has asserted State Secrets Privilege concerning much information that you possess?"

The basis for the Privilege may be classified, but the assertion of the Privilege is a public act,

11

and Plaintiff had every right to acknowledge knowledge of assertion of the Privilege over information she possesses.

Further, the Ethics in Government Act requires that Judge Walton file a yearly financial disclosure statement with the United States Judicial Conference. 5 U.S.C. Appx. §§101, 103. A disclosure may be redacted only "(i) to the extent necessary to protect the individual who filed the report; and (ii) for as long as the danger to such individual exists." 5 U.S.C. Appx. §105(b)(3)(B). The financial disclosure for Judge Walton covering the year 2003, the only disclosure statement that Plaintiff has obtained, redacts all information except for the date of the filing, Judge Walton's name, and the address of the D.C. federal district court. This is extraordinary, for it seems wholly unlikely that the disclosure of Judge Walton's financial investments endangers his physical security or the security of his family.

A recent GAO report found that between the years 1999-2002 less than 10 percent of federal judges requested a redaction of their financial disclosure statements. *Assessing and Formally Documenting Financial Disclosure Procedures Could Help Ensure Balance between Judges' Safety and Timely Public Access*, GAO-04-696NI.

Less than one percent of judges on average request complete redaction of their financial disclosure statements each year. *Id.*, 16. The great percentage of such requests are honored by the Committee on Financial Disclosure of the United States Judicial Conference, and great deference is paid to a judge's personal views on matters of secrecy and disclosure. *Id.* at 12.

Judicial sentiment on disclosure of financial statements varies. For example, the report found that "some judges view public scrutiny of their actions and finances as part of their role as a federal judge. Other judges are more sensitive to perceived threats and the risk that release of

12

information from their financial disclosure reports may pose and are more likely to request redactions of certain information." *Id.*, 12. Few judges, however, request total redaction.

Judge Walton has a deference to secrecy that would lead a reasonable person to conclude that he would not be impartial in ruling on matters concerning issues of confidentiality and disclosure of government held information. In the present case, the Defendant has explicitly stated that it holds open the resort to use of the States Secrets Privilege. Motion to Dismiss, 5 ("In the event that Plaintiff's Complaint is not dismissed in its entirety for the reasons described herein, the United States will evaluate the need to assert the state secrets privilege again in this lawsuit." ).

Under these circumstances, bearing in mind Judge Walton's great and undue deference to the State Secrets Privilege in *Burnett* and his own demonstrated personal penchant for secrecy as indicated in his completely redacted financial disclosure statement, it is a reasonable perception that Judge Walton will not be impartial in handling secrecy claims that may be made by Defendant in the present case.

## CONCLUSION

The unusual operation and results of the case assignment system concerning Plaintiff's cases combined with Judge Walton's apparent deference to secrecy and his own pursuit of secrecy, make it clear that the strictures of §455(a) have been met, and Plaintiff prays for Judge Walton's disqualification or recusal in the present case.

#

#

#

13

Respectfully submitted,

/s/

Sibel Edmonds
12 Wolfe Street
Alexandria, Virginia 22314
(703) 519-3640

March 22, 2006

14

# EXHIBIT A

Motion to Recuse or Disqualify
Civil Action No. 05-540 (RBW)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THOMAS BURNETT, SR., et al.,          )
                                      )
     Plaintiffs,                      )
                                      )
v.                                    )          Case Number: 04ms203 (RBW)
                                      )
AL BARAKA INVESTMENT &                )
DEVELOPMENT CORP., et al.,            )
                                      )
     Defendants.                      )
                                      )

## **ORDER**

On April 23, 2004, the Emergency Motion of the United States to Quash Deposition of

Sibel Edmonds, or for Protective Order ("Gov't Mot.") was filed with the Court in the above-

captioned case,[1] wherein the government asserted that "information sought by the deposition

subpoena is protected by the state secrets privilege, a privilege already asserted and under review

in the context of another case[,]" Edmonds v. United States Department of Justice, Civil Action

No. 02-1448 (D.D.C.). Gov't Mot. at 1. On April 26, 2004, this Court held a hearing on the

motion and issued an Order granting the government's emergency motion and provisionally

quashed the subpoena for the deposition of Sibel Edmonds until such time as the Court could

fully evaluate the government's position. Apr. 26, 2004 Order. Attorney General John Ashcroft

subsequently submitted a declaration to the Court on May 14, 2004, formally asserting the "claim

---

[1] Pursuant to 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

1

of the state secrets privilege in order to protect the foreign policy and national security interests of the United States." May 14, 2004 Notice of Filing, Exhibit ("Ex.") 1 (Declaration of John Ashcroft) ¶ 2. Upon reviewing the Attorney General's Declaration, on June 18, 2004, this Court issued an Order for the plaintiffs to produce a list of questions they propose to ask the deponent and for the United States to respond to this list of questions with an ex parte declaration, detailing why the state secrets privilege precludes the deponent from responding to each question. June 18, 2004 Order. Upon consideration of the parties' submissions, the ex parte in camera reviews of classified declarations, and for the reasons set forth below and more fully explained in the Memorandum Opinion addressing the government's motion to dismiss filed in the Edmonds case that is being issued contemporaneously with this Order, the Court will grant in part and deny in part the government's motion to quash the subpoena. Accordingly, the plaintiffs are prohibited from asking those questions that would reveal information the government has properly asserted falls under the umbrella of the state secrets privilege, but the plaintiffs are permitted to ask the deponent those questions that the government has not raised objections to in its ex parte declaration.

Federal Rule of Civil Procedure 45(c)(3)(A)(iii) states that "[o]n timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it requires disclosure of privileged or other protected matter and no exception or waiver applies[.]" Fed. R. Civ. P. 45(c)(3)(A)(iii). The government has asserted that "[t]he information over which the state secrets privilege has been asserted is information that would be disclosed by Ms. Edmonds' testimony here, and is information for which the disclosure, or risk of inadvertent disclosure, would cause serious damage to the national security and foreign policy interests of the United

2

States." Gov't Mot., Statement of Interest of the United States of America in Support of

Emergency Motion to Quash Deposition of Sibel Edmonds, or for Protective Order ("Gov't

Stat.") at 2. As indicated above, this Court has reviewed ex parte the classified declaration

submitted by the government in response to the Court's June 18, 2004 Order, which details why

the state secrets privilege prohibits the plaintiffs from asking the deponent certain proposed

questions. For all of the reasons expressed by this Court in its Memorandum Opinion addressing

the government's motion to dismiss filed in the Edmonds case that is being issued

contemporaneously with this Order, the Court concludes that the state secrets privilege has been

properly invoked by the Attorney General and, following a review of the classified declarations

submitted by the government, finds that if the plaintiffs' proposed questions that have been

objected to by the government were propounded to the deponent, there is a "reasonable danger"

that "secrets of state" would be revealed. In re United States, 872 F.2d 472, 475 (D.C. Cir.

1989). The Court notes that while some of these objectionable questions may seem innocuous,

one of the many concerns to the Court is that should the defendants desire to cross-examine the

deponent on the veracity of her claims, which undoubtedly would occur, the deponent would

inevitably have to reveal privileged information in order to establish the basis and source of her

knowledge. Moreover, the government accurately asserts that "it is clear that each of the

categories of information sought by plaintiffs in this case will require a discussion and

description of the nature of Ms. Edmonds' duties with the FBI, information that is protected by

the state secrets privilege and that has been classified by the FBI." Gov't Stat. at 12. As the

District of Columbia Circuit has stated:

> [i]t requires little reflection to understand that the business of foreign

3

> intelligence gathering in this age of computer technology is more akin to
> the construction of a mosaic than it is to the management of a cloak and
> dagger affair. Thousands of bits and pieces of seemingly innocuous
> information can be analyzed and fitted into place to reveal with startling
> clarity how the unseen whole must operate.

Ellsberg v. Mitchell, 709 F.2d 51, 58 (D.C. Cir. 1983) (quoting Halkin v. Helms, 598 F.2d 1, 8

(D.C. Cir. 1979)).  Therefore, because the Court finds that the government has properly invoked

the state secrets privilege, and that Rule 45(c)(3)(A)(iii) mandates that the Court prohibit the

plaintiffs from asking those questions objected to by the government in its ex parte declaration

submitted to the Court, it is hereby this 6th day of July, 2004

**ORDERED** that the Emergency Motion of the United States to Quash Deposition of

Sibel Edmonds, or for Protective Order is **GRANTED IN PART AND DENIED IN PART**.  It

is

**FURTHER ORDERED** that the plaintiffs are prohibited from asking the following

Proposed Questions: 2, 5, 7, 8, 9, 13, 16-31.  Accordingly, the plaintiffs are only permitted to ask

the deponent the remaining proposed questions that were not objected to by the government in its

ex parte classified declaration, specifically, Proposed Questions: 1, 3-4, 6, 10-12, 14-15.[2]  It is

**FURTHER ORDERED** that the government shall be permitted to have a representative

present at any deposition of Sibel Edmonds to monitor compliance with this Order and to

otherwise ensure that state secrets are not revealed.[3]

---

[2] Although the government's obligation to preserve the classified declarations that were reviewed by this Court in connection with this case is obvious, the Court reminds the government of its obligation to maintain the classified declarations in their original state until the appellate process has been exhausted.

[3] In the event government counsel interjects an objection to a question posed to or a response being provided by Ms. Edmonds during the course of the deposition, the proceedings as to that question or response shall cease immediately and shall not proceed further until the matter is brought to the Court and a ruling on the objection is issued by this Court.

**SO ORDERED**.


REGGIE B. WALTON
United States District Judge

5

# MOTLEY RICE LLC
### ATTORNEYS AT LAW

DIRECT DIAL: 843.216.9184
E-MAIL: RHAEFELE@motleyrice.com

Ronald L. Motley (SC)
Joseph F. Rice (SC)
Ann K. Ritter (SC, TN)
John J. McConnell Jr. (RI, MA, SC, DC)
William H. Narwold (CT)
Allard A. Allston III (SC)
John E. Herrick (SC, ND)
Edward E. Cottingham Jr. (SC)
M. Eric Bofrer (SC)
Robert J. McConnell (RI, MA)
Frederick C. Baker (SC, NY)
Fred Thompson, III (SC)
Jodi Westbrook Flowers (SC)
Paul J. Doolittle (SC)
Donald A. Migliori (RI, MA, MN)
Anne McGinness Kearse (SC)
Jeffrey B. Thompson (TX)
Mary F. Schiavo (MO, DC, MD)
Samuel E. Cottingham (SC, NC) (General Counsel)
Mills Lonstreet (SC)
J. Terry Foole (SC)
Lauren J. Loveland (1958–2000)
J.R. Haron (FL, DC)
Donni E. Young (LA)
Robert T. Haefele (NJ, PA)
Sheila A. Moore (SC, VA)
V. Brian Bevon (SC)
James M. Hughes (SC)
Rhett D. Klok (SC, DC, LA, TX, NM)
Frederick A. Jekel (SC)
Theodore H. Huge (SC, VA, DC)
John E. Guerry, III (SC)
Perrina E. Fitzpatrick (RI, MA, NY, DC)
Christy Trougwott (SC, FL, CO)
Suzanne Jackson Klok (SC, DC, LA, TX, NM)
Cindi Anne Solomon (SC)
Wm. Michael Graham (SC)
David P. Bivon (SC)
Michael E. Elsner (VA, NY)
Vincent L. Greene, IV (RI)
Marlon E. Kimpson (SC)
Stacie R. Taylor (AL, ND)
Ingrid L. Moll (CT)
Carolina A. Bernard (SC, LA)
Scott M. Galante (LA)
Kimberly D. Barone (SC, CA)
Elizabeth Smith (SC)
James W. Leslie (SC)
Michael G. Rousseau (CA, MA)
Lynn Seithel Jekel (SC)
Badge Humphries (TX)
Aileen L. Sprague (RI)
John A. Baden, IV (SC)
E. Claire Xidis (SC, NY, DC)
William E. Applegate, IV (SC)
Justyn B. Kaplan (CO)
Adam L. Marchuk (IL)

www.motleyrice.com

June 23, 2004

VIA FACSIMILE - 202-354-3292
Hon. Reggie Walton, U.S.D.J.
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

> Re:    Burnett, et al v. Al Baraka Investm. & Dev. Corp., et al
>         Subpoena for Deposition of Sibel Edmonds
>         Case Number 1:04-mc-203

Dear Judge Walton:

Motley Rice represents thousands of families in the September 11th litigation wherein our clients allege the defendants are responsible for financing the terrorist activities on September 11, 2001. As part of our ongoing investigation in the lawsuit filed in the United States District Court for the District of Columbia and transferred to the Southern District of New York, we served a subpoena upon former FBI translator Sibel Edmonds. As Your Honor is aware, the Department of Justice has objected to our subpoena and brought the matter before Your Honor.

This Monday, we received notice of your order directing us, on behalf of our client, to produce to you by today, Wednesday, June 23, 2004, a list of questions we propose to ask Ms. Edmonds in her deposition. Inasmuch as we are not on the court's ECF system (we have inquired into how to join that system, but have not received the information yet), we called Your Honor's chambers yesterday to determine how to provide the requested information and were asked to send them to you via facsimile. Accordingly, we are doing so. In addition, because the total package is voluminous, we are following up with a hardcopy via Federal Express.

In addition to sending the questions, we are sending with our hardcopy, via Federal Express, the documents referenced in the questions, so that you may see what documents we anticipate quoting from and showing to the witness during the deposition. Though these documents are only a small universe of the documents that quote Ms. Edmonds and report on her story, we suspect they may also provide some insight into the extent that Ms. Edmonds' statements have been spread.

Finally, we understand that an Inspector General report regarding an investigation into Ms. Edmonds' allegations may be forthcoming as soon as within the next four weeks. Depending on the findings of that report, we may recommend adding further questions to Ms. Edmonds' deposition and would reserve that opportunity.

MT. PLEASANT
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
843-216-9000
843-216-9450 FAX

BARNWELL
1750 Jackson St.
P.O. Box 365
Barnwell, SC 29812
803-234-8800

PROVIDENCE
321 South Main St
P.O. Box 6067
Providence, RI 02940
401-457-7700

NEW ORLEANS
1555 Poydras St.
Suite 1700
New Orleans, LA 70112
504-656-3860
504-656-3866 FAX

If Your Honor has any questions regarding these proposed questions, we would make ourselves available at your request.

Respectfully,

Robert T. Haefele
Attorney
Motley Rice, LLC

Enclosures

cc:      Mark S. Zaid, Esq.
         Krieger & Zaid, PLLC
         1747 Pennsylvania Avenue, N.W.
         Suite 300
         Washington, D.C. 20006
         Facsimile: (202) 454-2805 fax

         Vesper Mei, Esq.
         United States Department of Justice
         Civil Division, Federal Programs Branch
         Post Office Box 883
         Washington, D.C. 20044
         Facsimile: (202) 616-8470

### Proposed Questions for Sibel Edmonds Deposition

1. Please state your name?

2. When and where were you born?

3. When did you come to the United States?

4. Are you a resident of the United States?

5. Where did you go to school?

6. What is the level of your education?

7. What did you focus your studies on in school?

8. What languages do you speak?

9. What is your fluency or proficiency in each of these languages?

10. After your schooling, what was your first, etc., employment?

11. Have you ever been employed by the United States government?

12. During what time period were you employed by the United States government?

13. In what capacity have you been employed by the United States government?

14. Do you still work for the United States government?

15. Are you employed now? If so, what is your employment now?

16. Have you met Senate staff members in any unclassified conferences?

    a. When did that/those meeting(s) occur?
    b. Where did that/those meeting(s) occur?
    c. Who attended that/those meeting(s)?
    d. What statements, if any, have you disclosed in any unclassified conferences between you and Senate staff members?

17. Are you familiar with a June 19, 2002 Letter sent from Sen. Patrick J. Leahy and Sen. Charles E. Grassley to Inspector General Glenn A. Fine?

    a. In that letter, the senators state, "Ms. Edmonds has alleged, and the FBI has confirmed, that the FBI assigned a contract language 'monitor' to Guantanamo Bay, Cuba, contrary to clear FBI policy that only more qualified 'linguists' be assigned to Guantanamo Bay,"

        i. Did the senators accurately report what you alleged?
        ii. Were you telling the truth when you made those allegations?
        iii. Why did you make those allegations?

b.  In that letter, the senators state, "Ms. Edmonds has alleged, and the FBI has confirmed, that another contract linguist in the FBI unit to which Ms. Edmonds was assigned failed to translate at least two communications reflecting a foreign official's handling of intelligence matters. The FBI has confirmed that the contract linguist had 'unreported contacts' with that foreign official."

    i.  Did the senators accurately report what you alleged?
    ii.  Were you telling the truth when you made those allegations?
    iii.  Why did you make those allegations?

c.  In that letter, the senators also ask, "What guidance is provided to FBI contract linguists as to the steps they should take if they are concerned about a possible foreign attempt to penetrate or influence FBI operations? "

    i.  Where you ever provided any guidance as to the steps you should take if you became concerned about a possible foreign attempt to penetrate or influence FBI operations?
    ii.  If so, when were you given that guidance?

18.  Are you familiar with an August 13, 2002 Letter sent from Sen. Patrick J. Leahy and Sen. Charles E. Grassley to Attorney General John Ashcroft?

a.  In that letter, the senators state, "Ms. Edmonds has made a number of serious allegations, some of which the FBI verified were not unfounded during an unclassified briefing for Judiciary Committee staff on June 17."

    i.  Did you attend an unclassified briefing for Judiciary Committee staff on June 17, 2002?
    ii.  Is that the same meeting(s) discussed previously?
    iii.  If not, where did that/those meeting(s) occur?
    iv.  Who attended that/those meeting(s)?
    v.  What statements, if any, have you disclosed in any unclassified conferences between you and Senate staff members?

b.  In that letter, the senators state, "Edmonds has alleged that a contract monitor in her unit ... chose not to translate important, intelligence-related information, instead limiting her translation to unimportant and innocuous information."

    i.  Did the senators accurately report what you alleged?
    ii.  Were you telling the truth when you made those allegations?
    iii.  Why did you make those allegations?

c.  In that letter, the Senators also state, "Ms. Edmonds alleged that the same contract monitor once worked for an organization associated with a counter-intelligence investigation and that the monitor had contacts with a foreign national who was a member of the target institution."

    i.  Did the senators accurately report what you alleged?
    ii.  Were you telling the truth when you made those allegations?
    iii.  Why did you make those allegations?

2

d. In that letter, the senators also state, "Additionally, Ms. Edmonds states that some of the mistranslated recordings on which the monitor actually worked contained conversations by this same person with whom the monitor had such contacts and concerned matters pertinent to the investigation."

    i. Did the senators accurately report what you alleged?
    ii. Were you telling the truth when you made those allegations?
    iii. Why did you make those allegations?

19. Have you disclosed any statements in any unclassified conferences between you and Commissioners or staff members of the National Commission on Terrorist Attacks Upon the United States ("the 9/11 Commission").

    a. When did that meeting occur?
    b. Where did that meeting occur?
    c. Who attended that meeting?
    d. What statements, if any, have you disclosed in any unclassified conferences between you and Commissioners or staff members of the National Commission on Terrorist Attacks Upon the United States ("the 9/11 Commission")?

20. Statements have been attributed to you on various news websites, including the Washingtonpost.com website, posted on April 8, 2004, are you aware that these statements have been attributed to you?

    a. One statement attributed to you and reported on the Washingtonpost.com website on April 8, 2004, states that you read intelligence reports from the Summer of 2001 that reported that al-Qaeda operatives planned to fly hijacked airplanes into United States skyscrapers.

        i. Did the Washingtonpost.com website accurately report what you stated?
        ii. Were you telling the truth when you made that statement?
        iii. Why did you make that statement?

    b. Another statement attributed to you and reported on the Washingtonpost.com website on April 8, 2004, quotes you as saying that "There was general information about the time-frame, about methods to be used but not specifically about how they would be used and about people being in place and who was ordering these sorts of terror attacks."

        i. Did the Washingtonpost.com website accurately report what you stated?
        ii. Were you telling the truth when you made that statement?
        iii. Why did you make that statement?

    c. Another statement attributed to you and reported on the Washingtonpost.com website on April 8, 2004, quotes you as saying that you provided the 9/11 Commission's staff with "[s]pecific dates, specific target information, and specific managers in charge of the investigations".

        i. Did the Washingtonpost.com website accurately report what you stated?
        ii. Were you telling the truth when you made that statement?

      iii.  Why did you make that statement?

21.  In addition to the April 8, 2004 Washingtonpost.com website, are you aware that the Salon.com website has attributed statements to you in a posting dated March 27, 2004?

    a.  In statements attributed to you and reported similarly on the Washingtonpost.com website on April 8, 2004 and on the Salon.com website on March 27, 2004, did you respond to an Op-Ed piece authored by national security advisor Condoleezza Rice's Op-Ed wherein Dr. Rice stated that the United States had no intelligence warnings of al Qaeda's tactics?

        i.  Did the reports on the two websites, Washingtonpost.com and Salon.com, accurately report what you stated when they quote you as stating, "That is impossible" and "That's an outrageous lie. And documents can prove it's a lie."
        ii.  Were you telling the truth when you made those statements?
        iii.  Why did you make those statements?

    b.  Another statement attributed to you, as reported on the Salon.com website on March 27, 2004, states that the FBI had detailed information well before September 11, 2001, including information that a terrorist attack involving airplanes was being plotted.

        i.  Did the Salon.com website accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?
        iii.  Why did you make that statement?

    c.  That statement attributed to you, as reported on the Salon.com website on March 27, 2004, also states that the FBI had detailed information well before September 11, 2001, including information that terrorists were likely to attack the United States with airplanes.

        i.  Did the Salon.com website accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?
        iii.  Why did you make that statement?

    d.  Another statement attributed to you, as reported on the Salon.com website on March 27, 2004, quotes you as stating that the United States "should have had orange or red-type of alert in June or July of 2001. There was that much information available."

        i.  Did the Salon.com website accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?
        iii.  Why did you make that statement?

    e.  Another statement attributed to you, as reported on the Salon.com website on March 27, 2004, quotes you as stating that information you were translating, "often connected to terrorism, money laundering or other criminal activity, provide evidence that should have made apparent that an al-Qaida plot was in the works."

4

        i.   Did the Salon.com website accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?
        iii. Why did you make that statement?

    f.  Another statement attributed to you, as reported on the Salon.com website on March 27, 2004, quotes you as stating that the FBI had "specific information about use of airplanes, that an attack was on the way two or three months beforehand and that several people were already in the country by May of 2001."

        i.   Did the Salon.com website accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?
        iii. Why did you make that statement?

    g.  Another statement attributed to you, as reported on the Salon.com website on March 27, 2004, states that the FBI had information made available through an FBI informant, who had been a reliable informant for ten years, regarding specific terrorist plans and specific al-Qaeda cells active within the United States.

        i.   Did the Salon.com website accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?
        iii. Why did you make that statement?

22.   Are you aware that, in a posting dated August 11, 2003, Worldnet Daily has also attributed to your statements that WorldNet Daily claims you made to CBS?

    a.  One statement attributed to you and reported on WorldNet Daily states that another FBI translator named Melek Can ("Jan") Dickerson reviewed translations and omitted information crucial to the investigation of the events that occurred on September 11, 2001, such as discussions of methods to obtain U.S. military and intelligence secrets, and that Dickerson marked them as "not important to be translated."

        i.   Did the WorldNet Daily accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?
        iii. Why did you make that statement?

23.   Are you aware that, on January 26, 2004, the New York Observer, attributed to you statements about alleged FBI "security lapses in hiring and monitoring translators, about investigations compromised by incorrect or misleading translations sent to field agents, and about thousands of pages of translations alleged to be falsely labeled 'not pertinent' by Middle Eastern linguists who were either not qualified in a target language or English or who were protecting targets of investigations."

    a.  Did the New York Observer accurately report what you stated?
    b.  Were you telling the truth when you made that statement?
    c.  Why did you make that statement?

    d.  In that article the New York Observer also reported, "The Translation Department is treated by the F.B.I. as highly sensitive. Yet [Ms. Edmonds'] badge allowed her and other translators to enter and exit the building without passing through security, and within the sanctum itself they could pass freely

from floor to floor and to any agent's office. Ms. Edmonds saw several different individuals leave the building with documents or audio tapes in their gym bags. When she called security to report it, nothing was done.

    i. Did the New York Observer accurately report what you stated?
    ii. Were you telling the truth when you made that statement?
    iii. Why did you make that statement?

24. Are you aware that, on May 23, 2004, Newsday attributed to you statements that you told the 9/11 commission that you had seen documents saying that terrorists wanted to use planes to attack U.S. skyscrapers.

    a. Did the Newsday accurately report what you stated?
    b. Were you telling the truth when you made that statement?
    c. Why did you make that statement?

25. Are you aware that, on April 12, 2004, Newsweek attributed to you the following quote: "President Bush said they had no specific information about September 11 and that is accurate, but only because he said September 11?"

    a. Did Newsweek accurately report what you stated?
    b. Were you telling the truth when you made that statement?
    c. Why did you make that statement?

    d. That April 12, 2004, Newsweek article also attributed to you the statement that U.S. senior officials didn't know the exact date terrorists would strike, but they knew of Al Qaeda's plans to attack with aircraft.

        i. Did Newsweek accurately report what you stated?
        ii. Were you telling the truth when you made that statement?
        iii. Why did you make that statement?

26. Are you aware that, on April 14, 2004, The Independent — London, stated that you wrote a letter to a senior senator, suggesting that the commissioners of the 9/11 commission should ask FBI Director Mueller certain questions during the 9/11 commission hearings?

    a. Did you write such a letter?
    b. To whom did you address that letter?
    c. Did you send that letter?
    d. Has it been acknowledged as having been received? In what form of acknowledgement?
    e. In that letter, did you suggest that the commissioners ask Director Mueller, "is it true that certain translated information pre-and post-9/11 contained specific information regarding terrorists and their direct and indirect 'support networks' activities in the United States?"

        i. Why did you suggest that question?
        ii. Is it true that certain translated information pre-and post-9/11 contained specific information regarding terrorists and their direct and indirect 'support networks' activities in the United States?

    f.  Did you suggest that the commissioners ask Director Mueller, "Is it true that some of this information was available as early as April and May 2001?"

        i.  Why did you suggest that question?

        ii.  Is it true that some of this information was available as early as April and May 2001?

    g.  Did you suggest that the commissioners ask Director Mueller, "Is it true that some of these investigations were not forwarded to counter-terrorism, even after 9/11?"

        i.  Why did you suggest that question?

        ii.  Is it true that some of these investigations were not forwarded to counter-terrorism, even after 9/11?

27.  Are you aware that on April 5, 2004, The Toronto Star, attributed statements to you?

    a.  One statement attributed to you and reported in The Toronto Star states that you told the 9/11 commission that you have seen and handled intelligence documents and cables that show National Security Adviser Rice was wrong when she said there was no advance warning of air attacks on U.S. soil.

        i.  Did The Toronto Star accurately report what you stated?

        ii.  Were you telling the truth when you made that statement?

        iii.  Why did you make that statement?

    b.  Another statement attributed to you and reported in The Toronto Star states that you saw intelligence documents that pointed to the use of aircraft against skyscrapers in major U.S. cities.

        i.  Did The Toronto Star accurately report what you stated?

        ii.  Were you telling the truth when you made that statement?

        iii.  Why did you make that statement?

    c.  The Toronto Star quotes you as saying: "In terms of specific cities? Yes. It was not only New York and Washington, D.C. There were four or five cities specifically named."

        i.  Did The Toronto Star accurately report what you stated?

        ii.  Were you telling the truth when you made that statement?

        iii.  Why did you make that statement?

    d.  The Toronto Star also quotes you as saying: "There were specific activities known. Domestic institutions were being targeted and airplanes were going to be used. That was known."

        i.  Did The Toronto Star accurately report what you stated?

        ii.  Were you telling the truth when you made that statement?

        iii.  Why did you make that statement?

    e.  The Toronto Star article also states that the documents you referenced were mostly dates April and May, 2001.

        i.  Did The Toronto Star accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?

28.  On April 4, 2004, while interviewing 9/11 Commissioners Former Governor Tom Kean and Former Representative Lee Hamilton on the television program Meet the Press, interviewer Tim Russert stated that you said you had spent more than three hours testifying to the 9/11 commission.

    a.  Was Mr. Russert's comment that you testified to the 9/11 commission for more than three hours a correct statement?

    b.  Mr. Russert also stated that you stated that you had given the 9/11 commission information that was circulating within the FBI in the spring and summer of 2001 suggesting an attack using aircraft was months away and that that terrorists were in place.

        i.  Did Mr. Russert accurately report what you stated?
        ii.  Were you telling the truth when you made that statement?

29.  Did you write a letter dated February 16, 2004, to Senator Charles Grassley?

    a.  Is this the letter?
    b.  Did that letter include statements alleging that severe problems have existed within the FBI's translation department since before September 11, 2001?

        i.  Were you telling the truth when you made those statements?
        ii.  Why did you make those statements?

    c.  Did that letter include statements alleging that within the FBI translation department, translations were being blocked, mistranslated, and delayed?

        i.  Were you telling the truth when you made those statements?
        ii.  Why did you make those statements?

    d.  Did that letter include statements alleging that, because translations within the FBI translation department that were being blocked, mistranslated, and delayed included items related to the terrorist attacks that happened on September 11, 2001, the security of our country and our ability to discover and prevent another planned terrorist attack continued to be seriously compromised?

        i.  Were you telling the truth when you made those statements?
        ii.  Why did you make those statements?

    e.  Did that letter include statements alleging that sympathizers within the FBI's language department and agents of foreign organizations within the FBI's language department could block or mistranslate information and thereby prevent information from being properly translated?

8

          i.   Were you telling the truth when you made those statements?
          ii.  Why did you make those statements?

30.   On Sunday, October 27, 2002, the television news program "60 Minutes" aired an interview wherein Ed Bradley asked you questions, correct?

    a.   The transcript of that program indicates a series of questions and answers wherein the exchange is as follows, and I represent that this is an accurate representation of the exchange from the Federal Document Clearing House copyrighted version of this interview:

> BRADLEY (voice-over): Edmonds says that the supervisor, in an effort to slow her down, went so far as to erase completed translations from her FBI computer after she'd left work for the day.
>
> EDMONDS: The next day, I would come to work, turn on my computer and the work would be gone. The translation would be gone. Then, I had to start all over again and retranslate the same document.
>
> And I went to my supervisor and he said, "Consider it a lesson and don't talk about it to anybody else and don't mention it."

          i.   Is that an accurate representation of your exchange?
          ii.  Were you telling the truth when you made those statements?
          iii. Why did you make those statements?

31.   Are you aware that United States Attorney General Ashcroft has asserted States Secret Privilege concerning much information that you possess?

    a.   Has General Ashcroft or anyone from the Department of Justice, or any other governmental entity, explained to you why General Ashcroft has asserted that privilege over what you know? If so, please tell us the answer?
    b.  Has General Ashcroft or anyone from the Department of Justice, or any other governmental entity, explained to what that privilege entails? If so, please tell us the explanation?
    c.   Has General Ashcroft or anyone from the Department of Justice, or any other governmental entity, explained to you what you may or may not speak about? If so, please tell us what they have explained?
    d.  Has General Ashcroft or anyone from the Department of Justice, or any other governmental entity, advised you after any of your public comments that you should not have made the statements that you have made? If so, please tell us what they have told you?

# EXHIBIT B

Motion to Recuse or Disqualify
Civil Action No. 05-540 (RBW)

**Examples of News Media Coverage**

**"Judge Reggie Walton: From Oklahoma City to 9/11 to Valerie Plame/Libby Case"**
**Commentary / Current News about 9-11**
**By W. David Jenkins III – January 21, 2006**
**http://www.911citizenswatch.org/print.php?sid=803**

"* * *

So to quickly sum up, we have a judge with little background available, with long ties to the Bush's, who someone doesn't want the public to know his financial dealings, who has denied requests for domestic intelligence records (at least once), who has now been mysteriously 'randomly assigned' to not only hear Edmonds' FTC case, but is also assigned to a case regarding a senior White House official with whom this judge and the defendant worked with the White House at the same time, albeit in different capacities. Have we flunked the infamous Dan Burton 'smell test' yet?

Now, let's do some of those notorious dots, shall we? A small sampling of coincidences (a term which the past actions of this administration prevent me from believing applies to these criminals) suggests how tangled things are lately.

Walton gets 'randomly' assigned to Edmonds ' original case regarding the gag order after things get bogged down under the original judge appointed to the case in 2002. Edmonds ' attorneys then file a motion asking the case to be assigned to Judge Ellen Segal Huvelle, who is also the judge for Edmonds ' FOIA case filed in May 2002. Edmonds ' attorneys argue that the cases were related under the D.C. circuit rules, and so they should both be handled by Judge Huvelle. The court grants Edmonds ' attorneys request and yet, two weeks after Huvelle is assigned, Walton is reappointed to her case without any explanation. An interesting side note; Huvelle is also the judge who presided over Jack Abramoff's guilty plea.

From February 2003 to April 2004, Walton repeatedly scheduled and postponed hearings in the Edmonds case without citing any reason. There was no communication from Walton to Edmonds' attorneys from October '03 to April '04 until a lawsuit on behalf of one thousand 9/11 families was filed which requested a deposition from Sibel Edmonds. Only then, does Walton move (at the government's request) to not only quash Edmonds ' subpoena on behalf of the 9/11 families, but also upholds the gag order imposed on her using the State Secrets Privilege. So now let's fast forward to Libby's case.

Edmonds has confirmed that Walton's involvement with her original case along with her FTC case has allowed him to be privy to information regarding many of the same players that also appear in the Plame case, most notably, certain Turkish-American organizations. These would be the same semi-legit organizations that were FBI targets of investigation which Edmonds had discovered were being ignored by fellow intelligence translators from within the FBI!

These would also be the same targets that are alleged to have contributed tens of thousands of dollars to Republican Speaker of the House, Dennis Hastert. But as hard as it can be, let's not lose focus here.

As Edmonds has stated, the cast of players she stumbled upon during her time at the FBI and some of the very same people that Valerie Plame was investigating involved the actions of top officials in the government and a lot of illegal activities that include multi-billion-dollar drug-smuggling operations, black-market nuclear sales to terrorists and unsavory regimes. In an August 5th interview, Edmonds said, 'You can start from the AIPAC angle. You can start from the Plame case. You can start from my case. They all end up going to the same place, and they revolve around the same nucleus of people'.

Sibel Edmonds testified to all of this and more in a closed session with the Philip Zelikow led 9/11 Commission. Obviously, her testimony was considered too controversial as the Commission completely omitted the information from their final report. Now, the Bush administration has again called on the shadowy Judge Walton to insure that the truth regarding Edmonds , Plame, Libby , Iraq , 9/11 and all things Bush never sees the light of day.

Judge Walton demands much more attention than he's been given. The mainstream media is obviously oblivious to the effect he will have on the outcome of both the Edmonds case and Libby's trial. As we have seen, there is far too much at stake to allow any sense of true justice to prevail.

After all these years, there are still far too few Americans who realize that the war on terror is being 'selectively waged' as Edmonds so desperately wants the right to prove to everyone. Now we are confronted by an administration that states that spying on Americans is "essential to our safety" and that it allows them to do "everything possible to wage war on those who wish us harm." Sibel Edmonds is proof that they are lying their faces off.

And Judge Walton is the administration's insurance policy which will allow them to maintain 'business as usual'."

**"Stacking the Deck to Save the Administration"**
**Posted on Tuesday, January 10 @ 04:00:00 EST**
**By Christopher Deliso**

"* * *

At the same time, we will also see how these precedents may inform the upcoming Libby trial, with special attention given to the trial's appointed judge – Reggie Walton, allegedly selected 'randomly', but repeatedly and specifically chosen for cases presented by FBI whistleblower Sibel Edmonds since 2002. In his 2004 decision, Walton ruled 'with much consternation' to uphold the government's line that Edmonds could not present her case because it would threaten national security.

* * *

If America truly wants to start setting an example, then, it could start by really honoring its institutions and laws, rather than just making a smoke-and-mirrors simulation of their application. For Judge Walton to recuse himself from both the Edmonds and Libby cases would

be a fine way to start.

**"Judge in Scooter Libby, Sibel Edmonds cases is redacted in action"**
**By Bill Conroy**
**The Narcosphere**
**December 17, 2005**
**http://narcosphere.narconews.com/story/2005/12/17/181422/49**

"* * *

So Judge Walton seems to be in a critical role in serving as the point man in the federal judicial system for two explosive cases — the Edmonds civil case and Libby's criminal case — both of which have vast implications for the White House and for the country in general.

So shouldn't we know who's buttering Walton's bread in terms of financial backing? Why have ethics rules mandating such disclosures, if the information is not disclosed in cases, such as these, where the stakes are so high?

Well, it seems, at least according to the only document that Judicial Watch could shake loose in its public-records quest, that Walton doesn't think so. His financial disclosure statement, the one released for public inspection through Judicial Watch, is completely redacted, every line of it.

* * *

Now, ask yourself, why would that be, and what might lurk in the shadows of Judge Walton's fiscal closet? If there nothing to hide, then there is nothing to lose by shedding some light on the retractions, is there?"

**"Libby's Arraignment Judge: Reggie Walton"**
**By Cedwyn**
**The Daily Kos**
**www.dailykos.com**
**October 29, 2005**
**http://www.dailykos.com/storyonly/2005/10/29/14622/773**

"* * *

Just how great is that consternation? Who knows. IANAL and I won't pretend to know the intricacies of how his various positions translate legally. Like I said, Walton seems to be rather a mixed bag. Needless to say, I'm troubled by the ruling in the Edmonds case. It is incomprehensible to me that a violation of individual rights can be so cavalierly dismissed, state secrets or no. I just hope that his "consternation" was more than lip service. And with any luck, we'll find out soon; Libby's arraignment is in a few weeks."

**"Libby's Judge Carefully Chosen: The Fix in In"**
**Breakfornews.com**
**http://breakfornews.com/my/modules.php?op=modload&name=News&file=article&sid=20**

3&mode=thread&order=0&thold=0

"If you had any doubts about our assertion that PlameGate is a contrived scandal, then ponder the implications of this:

Judge Reggie Walton will be presiding over the arraignment of 'Scooter' Libby. So, who is Reggie Walton? Walton is the Bush-appointed judge who handled the Stephen Hatfill anthrax case and who also upheld the government's right to state secrets in the Sibel Edmonds case!

In March, 2004, Reggie B. Walton granted the FBI's request to postpone Steven Hatfill's defamation suit in the anthrax case, claiming that the investigation was in a sensitive phase.

Like the Sibel Edmond's case -this was another contrived 'scandal' which went nowhere.

When the CIA/NSA run these kind of Ops, they need a judge who is a safe pair of hands.

Or to put it another way: they need a judge who is in on it."


**"Judge Walton is Back, Assigned to the Libby Case"**
**by Rebecca Williams**
**March 6, 2006**
**Democracy for America, Fairfax, Virginia**
**www.dfa-fairfax.com**
**http://www.dfa-fairfax.com/index.php?option=com_content&task=view&id=152&Itemid=1**

(Editor's Note: It seems that Judge Reggie Walton keeps getting "randomly" assigned to sensitive cases involving whistleblowers. He has been assigned to the Sibel Edmonds case and now he is assigned to the Libby case)

"* * *

And now, true to their sleazy ways of doing 'business as usual' as Edmonds calls it, the Bush Cabal is going to add insult to Edmonds ' injury. They're going to poke her in the eye with 'Scooter' Libby's get of jail free card. Allow me to introduce, as well as concentrate on, Judge Reggie Walton.

Walton is the judge who will not only be presiding over the Libby case, but he has also been 'randomly assigned' to Edmonds' Federal Tort Claim after having upheld her ridiculous gag order imposed by former attorney general, John Ashcroft. I call the gag order ridiculous because technically Edmonds' driver's license, birth certificate and any potential job applications she might file can be considered a 'state secret' under the provisions set. As I've said many times before, somebody is very worried about what Edmonds wants to talk about.

Very little is known about Walton and it would seem that there are those, including Walton, who would just assume keep it that way. But what little is known should be enough to set off all kinds

of bells and whistles, beginning with his long history with the Bush gang."

**"The Rat's Nest of 9/11: Part 2**
**'Scooter', Reggie & the Birds of a Feather"**
**by Fintan Dunne**
**BreakForNews.com**
**14 Feb, 2006**
**http://breakfornews.com/forum/viewtopic.php?p=454**

"* * *

Reggie Walton is the judge who handled the Stephen Hatfill anthrax case. In March, 2004, Walton granted the FBI's request to postpone Hatfill's defamation suit, claiming that the investigation was in a sensitive phase. Which is a bit of a sick joke, as the FBI's investigation has always been in a "sensitive" phase. Just like all other government Ops.

And it was Walton who upheld the government's right to state secrets in the Sibel Edmonds case! Another contrived 'scandal' which went nowhere.

Does this guy turn up in all the right places, or what? When the Establishment run these kind of Ops, they need a judge who is a safe pair of hands. Or to put it another way: they need a judge who is in on it.

* * *"

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of March 2006, a copy of the foregoing MOTION

FOR RECUSAL AND/OR DISQUALIFICATION was delivered via facsimile and mailed, first

class, postage pre-paid, to:

> KIMBERLY D. ZIROPOULOS
> D.C. Bar # 460772
> Torts Branch, Civil Division
> U.S. Department of Justice
> P.O. Box 888, Ben Franklin Station
> Washington, D.C. 20044
> Telephone: (202) 616-4270
> Facsimile: (202) 616-5200
> Attorneys for Defendant
> United States of America

Respectfully Submitted

/s/

Sibel Edmonds
12 Wolfe Street
Alexandria, Virginia 22314
(703) 519-3640